POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW AMICARELLI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FIRST HORIZON CORPORATION, D. BRYAN JORDAN, HOPE DMUCHOWSKI, THE TORONTO-DOMINION BANK, TD BANK US HOLDING COMPANY, BHARAT B. MASRANI, KELVIN VI LUAN TRAN, and LEO SALOM,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Andrew Amicarelli ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge

1

as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents; conference calls and announcements made by Defendants; United States ("U.S.") Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding First Horizon Corporation ("FHN") and The Toronto-Dominion Bank and its subsidiaries, including wholly owned subsidiary TD Bank US Holding Company ("TD Bank US") (collectively, "TD Bank" and, together with FHN, the "Companies"); analysts' reports and advisories about the Companies, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of a class ("Class") consisting of all persons and entities other than Defendants that purchased or otherwise acquired FHN securities between February 28, 2022 and May 3, 2023, both dates inclusive (the "Class Period"), to recover damages from the Defendants for their violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, as detailed below.

2.      FHN is a bank holding company headquartered in Memphis, Tennessee that, as of December 31, 2022, had consolidated assets of $79 billion. FHN provides consumer and commercial banking, wealth management, mortgage lending and other financial services primarily through its principal subsidiary, First Horizon Bank. As of December 31, 2022, FHN operated 414 banking centers in twelve states.

3.      TD Bank is a Canadian financial institution with U.S. headquarters in this Judicial District. As of October 31, 2022, TD Bank had $1.9 trillion in assets. Since 2004, TD Bank has expanded its retail banking presence in the U.S. through acquisitions of regional banks.

4.      On February 28, 2022, FHN and TD Bank jointly announced that TD Bank had agreed to acquire FHN for $25.00 per share in cash ("Transaction"), which represented a 37% premium to FHN's share price from its close on the prior trading day.

5.      With respect to the timeline for closing the Transaction, a joint press release ("Feb 2022 Press Release") issued by TD Bank and FHN on February 28, 2022, announcing the deal explained that the "***transaction is expected to close in the first quarter of TD's 2023 fiscal year***, and is subject to customary closing conditions, including approvals from First Horizon's shareholders and U.S. and Canadian regulatory authorities."[1] The Feb 2022 Press Release further advised that

---

[1] All emphases in bold and italics herein are added unless otherwise stated.

(i) if "the transaction does not close prior to November 27, 2022 [i.e., within 9 months], First Horizon shareholders will receive, at closing, an additional US$0.65 per share on an annualized basis for the period from November 27, 2022 through the day immediately prior to the closing," and (ii) "[t]he transaction will terminate, unless otherwise extended, if it does not close by February 27, 2023."

6.    On a conference call to discuss the Transaction held on February 28, 2022 ("Feb 2022 Conf Call"), an analyst observed that "there's a lot of sensitivity around regulatory approval process for M&A in the U.S.," and then asked TD Bank's senior management about their "comfort level on getting deal closing done" within the timeline announced. Defendant Bharat B. Masrani ("Masrani") responded:

> *We at TD pride ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking*. So we will follow the customary regulatory requirements that you would expect us to do . . . our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023. *So our expectation is that this will get approved and get closed around the 9-month mark*.[2]

7.    Thereafter, Defendant Masrani repeatedly reassured analysts and investors that there were no regulatory risks that might delay the closing of the

---

[2] TD Bank provided FHN shareholders with a transcript of the Feb 28 Conf Call by filing it on Schedule 14A as Soliciting Material under 17 C.F.R. §240.14a-12 ("Section 240.14a-12").

Transaction. On May 26, 2022, on TD Bank's Q2 2022 earnings call, when asked about the regulatory timeline for the Transaction, Defendant Masrani responded, "[o]ur process continues. ***And we did this transaction on the basis that . . . it meets all the requirements of all the regulators***."

8.      On a subsequent conference call on August 2, 2022 to discuss recent acquisitions, when asked whether he had any reason "to believe why the deal [to acquire FHN] may not close as per the original timeline," and whether there were any "regulatory or other issues that may delay the deal at this point," Defendant Masrani responded:

> ***No. I have no reason to believe that*** . . . . It is following its normal process within the US regulatory requirements. And we obviously cannot talk about our conversations with our regulators would feel comfortable that ***is proceeding at the pace we expected and we are hoping that we can close it within the timeline we have stipulated***.

9.      On August 25, 2022, on TD Bank's Q3 2022 earnings call, Defendant Masrani reiterated that he expected the Transaction "to close in the first fiscal quarter of 2023." When asked yet again about any risks that may delay the Transaction from closing, Defendant Masrani responded, "[o]ur deal continues to progress in the normal course, ***there is nothing out there to suggest that, that is different this time around***."

10.      Defendant Masrani was not the only TD Bank executive to reassure analysts concerning the timeline for closing the Transaction. On September 14,

2022, at the Barclays Global Financial Services Conference, when asked for an update on the timeline for the Transaction, Defendant Leo Salom ("Salom"), Group Head, U.S. Retail, TD Bank Group and President and Chief Executive Officer ("CEO"), TD Bank, advised that "[w]e do expect to close the transaction at the end of the fiscal first quarter. And we're tracking well against that." Defendant Salom then added:

> [O]n August 18th we had the public hearing, the OCC, the Fed hosted. That is the normal part of the application process. ***But to your point, I'm sure there's going to be a lot of questions about how confident are we? We're extremely confident***. We believe this transaction does not represent any financial stability or competitive consolidation risk. We've already announced that we will protect all the front-line staff, we will be retaining all the retail and commercial bankers. Likewise, we won't be closing any stores. ***So, if you look at the strength of the application, we're quite excited about getting this done in short order***.

11.    Based on the repeated reassurances provided by Defendants Masrani and Salom that there were no regulatory risks that could delay the closing of the Transaction, FHN shareholders had no reason to believe that TD Bank was concealing any regulatory risks that could derail the Transaction. Unbeknownst to FHN shareholders, however, (i) TD Bank had materially deficient policies and procedures for detecting and reporting suspected money laundering, (ii) regulators at the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve were refusing to approve the Transaction because of TD Bank's materially deficient anti-money laundering ("AML") policies and procedures, and (iii) TD Bank's

materially deficient AML policies and procedures thus constituted a concealed regulatory risk to the closing of the Transaction.

12.    TD Bank's public statements concerning its risk management practices in general, and AML compliance in particular, gave no indication that TD Bank's AML policies and procedures were materially deficient. To the contrary, an investor presentation made available by TD Bank to FHN shareholders on Schedule 14A on February 28, 2022, advised that TD Bank has "*a disciplined risk culture*." That "disciplined risk culture" was documented in part in TD Bank's Code of Conduct and Ethics for Employees and Directors ("TD Bank Code"), which was filed on Form 6-K with the SEC on February 7, 2022. With respect to AML compliance, the TD Bank Code stated:

> ***TD is committed to taking all reasonable and appropriate steps to detect and deter persons engaged in money laundering from utilizing TD products or services to do so***. Making the proceeds of criminal activity appear as if they came from legitimate sources is a criminal offence, and so is knowingly failing to report transactions or activities where it is suspected they relate to money laundering. ***We must not knowingly initiate or be party to money laundering and must promptly report suspected money laundering situations in accordance with the TD Bank Group Enterprise Anti-Money Laundering and Anti-Terrorist Financing Policy and the escalation procedures established for our business or region***.

13.    Subsequently, in March 2022, TD Bank published its "TD Bank Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions" ("AML Statement"), which represented that TD Bank's commitment to detect and

deter persons engaged in money laundering was formalized through "the establishment of an enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF) and Sanctions risk and compliance management program (Global AML Program) that is designed to detect and report suspected money laundering and terrorist financing and activity prohibited by sanctions." The AML Statement further represented that among the requirements of the Global AML Program were (i) "ongoing monitoring to detect and report suspicious transactions or activities," (ii) "regulatory reporting of prescribed transactions," and (iii) "independent testing of control effectiveness."

14.    The first inkling that regulatory issues may derail approval of the Transaction surfaced on TD Bank's Q4 2022 earnings call on December 1, 2022. Defendant Masrani advised that TD Bank was "planning to close the [Transaction] in the ***first half of fiscal 2023*** subject to customary closing conditions, including approvals from U.S. and Canadian regulatory authorities." After observing that Defendant Masrani had previously guided on the Q3 2022 earnings call that the Transaction would close in ***Q1 2023***, and that the timing had now slipped to the ***first half of 2023***, an analyst inquired "[w]hat's prompting the delayed expectation of closing?" Defendant Masrani responded, "so we don't control the timing of all the regulatory approvals, ***but we are confident that we will get closing within the time line that we've put out***." When the analyst pressed for specifics—"are they taking a

8

closer look at anything? Are you anticipating having to make any adjustments to your product going up or your schedule in advance of the close?"—Defendant Masrani advised, "*No, I'm not aware of anything of the sort you're mentioning*."

15.    Yet, just over two months later, on February 9, 2023, the Companies issued a joint press release ("Feb 2023 Press Release") announcing that they had mutually agreed to extend the deadline to close the Transaction from February 27, 2023, to May 27, 2023. The Feb 2023 Press Release further stated that "[c]ustomary closing conditions, including approvals from regulatory authorities in the U.S. and Canada, are required to close the transaction." The generic disclosure, however, was insufficient to alert FHN shareholders to the existence of regulatory risks since it failed to disclose the specific risk that TD Bank's materially deficient AML policies and procedures were posing to regulatory approval of the Transaction.

16.    On March 1, 2023, in its 2022 Form 10-K (filed before the markets opened), FHN advised that (i) receipt of regulatory approval of the Transaction was taking longer than originally anticipated, (ii) TD Bank had recently informed FHN that TD Bank did not expect to receive the necessary regulatory approvals in time to close the Transaction by a new deadline of May 27, 2023, and (iii) TD Bank had initiated discussions with FHN regarding a potential further extension of the new May 27, 2023 deadline.  The 2022 Form 10-K also noted that "*TD cannot provide a new projected closing date at this time*."

17.    On this news, FHN's stock price fell $2.63 per share, or 10.62%, to close at $22.14 per share on May 1, 2023.

18.    On May 3, 2023, according to a Capital Forum report being circulated among traders, Defendant Masrani had a meeting with officials of the OCC concerning the Transaction on March 9, 2023, that was also attended by TD Bank's outside counsel.

19.    On this news, FHN's stock price fell $1.14 per share, or 7.04%, to close at $15.05 per share on May 3, 2023.

20.    On May 4, 2023, before the markets opened, TD Bank and FHN announced that they had mutually agreed to terminate the Transaction because TD Bank "does not have a timetable for regulatory approvals to be obtained for reasons unrelated to First Horizon," and "there is uncertainty as to when and if these regulatory approvals can be obtained." TD Bank and FHN, however, failed to disclose that TD Bank's materially deficient AML policies and procedures had derailed regulatory approval of the Transaction.

21.    Upon news of the termination of the Transaction, FHN's stock price fell $4.99 per share, or 33.16%, to close at $10.06 per share on May 4, 2023.

22.    The concealed regulatory risk that derailed the Transaction was finally revealed on May 8, 2023, when *The Wall Street Journal* (the "*WSJ*") published an article citing sources alleging that TD Bank's "handling of suspicious customer

transactions was behind regulators' refusal to bless" the Transaction, and that the Transaction was terminated because regulators were unwilling "to give TD a clean bill of health on its anti-money laundering practices."  The article's sources alleged that "regulators' concerns stemmed from the way TD handled unusual transactions in recent years, and the speed at which some of them were brought to the attention of U.S. authorities." According to the *WSJ*, in "recent years," TD Bank had only "flagged 28 customer transactions" as suspicious.  For these reasons, the OCC and the Federal Reserve refused to approve the Transaction within the necessary time frames.

23.    Defendants' materially false and misleading statements and omissions concerning the risks to regulatory approval of the Transaction posed by TD Bank's materially deficient AML policies and procedures caused Plaintiff and other Class members to suffer significant losses when these undisclosed regulatory risks materialized and caused the market value of FHN's securities to decline precipitously.

## JURISDICTION AND VENUE

24.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

26.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  TD Bank US is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.  Further, because FHN's shares trade on the New York Stock Exchange ("NYSE"), there are presumably hundreds, if not thousands, of investors in FHN securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

27.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

28.    Plaintiff, as set forth in the attached Certification, acquired FHN securities at artificially inflated prices during the Class Period and suffered losses when the undisclosed risks to the consummation of the Transaction improperly concealed by Defendants materialized.

29.    Defendant FHN is incorporated in Tennessee with principal executive offices located at 165 Madison Avenue, Memphis, Tennessee 38103.  FHN's common stock trades in an efficient market on the NYSE under the ticker symbol "FHN."

30.    Defendant D. Bryan Jordan ("Jordan") has served as FHN's Chairman of the Board, President, and CEO at all relevant times.

31.    Defendant Hope Dmuchowski ("Dmuchowski") has served as FHN's Senior Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

32.    Defendants Jordan and Dmuchowski are sometimes referred to herein collectively as the "Individual FHN Defendants."

33.    The Individual FHN Defendants possessed the power and authority to control the contents of FHN's SEC filings, press releases, and other market communications.  The Individual FHN Defendants were provided with copies of FHN's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with FHN, and their access to material information available to them but not to the public, the Individual FHN Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive

representations being made were then materially false and misleading. The Individual FHN Defendants are liable for the false statements and omissions pleaded herein.

34.    Defendant The Toronto-Dominion Bank is a Canadian corporation with principal executive offices located at Toronto-Dominion Centre, Toronto, Ontario M5K 1A2. The Toronto-Dominion Bank's common stock trades in an efficient market on the NYSE under the ticker symbol "TD."

35.    Defendant TD Bank US is a Delaware corporation with principal executive offices located at 1701 Route 70 East, Cherry Hill, New Jersey 08034. TD Bank US is a wholly owned subsidiary of The Toronto-Dominion Bank.

36.    Defendant Masrani has served as TD Bank's Group President and CEO at all relevant times.

37.    Defendant Kelvin Vi Luan Tran ("Tran") has served as TD Bank's Group Head and CFO at all relevant times.

38.    Defendant Salom has served as TD Bank's Group Head, U.S. Retail, TD Bank Group and President and CEO of TD Bank America since early 2022.

39.    Defendants Masrani, Tran, and Salom are sometimes referred to herein collectively as the "Individual TD Bank Defendants."

40.    The Individual TD Bank Defendants possessed the power and authority to control the contents of TD Bank's SEC filings, press releases, and other market

communications.  The Individual TD Bank Defendants were provided with copies of TD Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with TD Bank, and their access to material information available to them but not to the public, the Individual TD Bank Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual TD Bank Defendants are liable for the false statements and omissions pleaded herein.

41.    The Individual FHN Defendants and Individual TD Bank Defendants are sometimes referred to herein collectively as the "Individual Defendants."

42.    FHN and the Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

### False and Misleading Pre-Class Period Statements by TD Bank
### Regarding its AML Compliance

43.    According to TD Bank's 2021 Annual Information Form filed on Form 40-F ("2021 Form 40-F") with the SEC on December 1, 2021, the Audit Committee of the Board of TD Bank ("Audit Committee") is charged with overseeing and monitoring the "establishment, maintenance and ongoing effectiveness of the Anti-

Money Laundering /Anti-Terrorist Financing/ Economic Sanctions/Anti-Bribery and Anti-Corruption Program ('AML Program') that is designed so that the Bank is in compliance with the laws and regulations that apply to it as well as its own policies."

44. The Management's Discussion and Analysis for 2021 ("2021 MD&A"), which was filed as part of the 2021 Form 40-F, further explained that the Audit Committee oversaw the "***the activities of the Bank's Global Anti-Money Laundering (GAML) group***." The 2021 MD&A stated that "[t]he GAML Department is responsible for regulatory compliance with AML, Anti-Terrorist Financing, Economic Sanctions, and antibribery/anti-corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies ***so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated***." TD Bank incorporated the 2021 MD&A by reference into its subsequent quarterly reports in 2022 on Form 6-K.[3]

---

[3] On December 1, 2022, during the Class Period, TD Bank filed its Management's Discussion and Analysis for 2022 (the "2022 MD&A") with the SEC on Form 40-F. Like the 2021 MD&A, the 2022 MD&A made similar false and misleading claims regarding the ability of TD Bank's AML policies and procedures to appropriately identify and mitigate "money laundering, terrorist financing, economic sanctions, and bribery and corruption risks."

45.    On February 7, 2022, TD Bank filed the TD Bank Code with the SEC

on Form 6-K. With respect to AML compliance, the TD Bank Code stated:

> ***TD is committed to taking all reasonable and appropriate steps to
> detect and deter persons engaged in money laundering from utilizing
> TD products or services to do so***. Making the proceeds of criminal
> activity appear as if they came from legitimate sources is a criminal
> offence, and so is knowingly failing to report transactions or activities
> where it is suspected they relate to money laundering. We must not
> knowingly initiate or be party to money laundering and ***must promptly
> report suspected money laundering situations in accordance with the
> TD Bank Group Enterprise Anti-Money Laundering and Anti-
> Terrorist Financing Policy and the escalation procedures established
> for our business or region***.[4]

46.    As discussed below, contrary to the representations and other

statements in the filings above, TD Bank's AML policies and procedures were

materially deficient at all relevant times, including because TD Bank did not (i)

appropriately identify and mitigate all money laundering risks, (ii) take all

"reasonable and appropriate steps to detect and deter persons engaged in money

laundering from utilizing TD products or services to do so," and (iii) "promptly

report suspected money laundering situations" to the appropriate U.S. regulatory

authorities. Further, Defendants knew or were reckless in not knowing that such

material deficiencies would prevent TD Bank from securing regulatory approval

---

[4] On February 14, 2023, during the Class Period, TD Bank filed a Form 6-K with
the SEC that included a revised Code of Conduct.  The revised Code of Conduct
repeated the same misstatements concerning the effectiveness of TD Bank's AML
policies and procedures.

from the OCC and Federal Reserve for the Transaction. Yet, as detailed below, Defendants repeatedly reassured investors and analysts that they were not aware of any regulatory risks that could delay or derail the Transaction.

**Defendants' Materially False and Misleading Statements**
**Issued During the Class Period**

47.    The Class Period begins on February 28, 2022, when the Companies jointly issued the Feb 2022 Press Release, which was also filed with the SEC by FHN on Form 8-K, and by TD Bank on Form 6-K. The Feb 2022 Press Release announced that TD Bank had entered into an agreement to purchase all of the outstanding shares of FHN for $25.00 per share in cash.

48.    The Feb 2022 Press Release projected that the "[T]ransaction is expected to close in the first quarter of TD's 2023 fiscal year, and is subject to customary closing conditions, including approvals from First Horizon's shareholders and U.S. and Canadian regulatory authorities."

49.    Additionally, on February 28, 2022, TD Bank provided a presentation concerning the Transaction directly to FHN shareholders by filing it with the SEC on Schedule 14A as Soliciting Material under Section 240.14a-12.  The presentation stated that, "*[l]ike TD, First Horizon has a strong team with a growth mindset and a disciplined risk culture*."

50.    On February 28, 2022, TD Bank held a conference call in connection with the announcement of the Transaction.  TD Bank provided a transcript of the

Feb 28 Conference Call to FHN shareholders by filing it with the SEC on Schedule 14A as Soliciting Material under Section 240.14a-12. On the call, an analyst observed that "there's a lot of sensitivity around regulatory approval process for M&A in the U.S.," and then asked TD Bank's senior management about their "comfort level on getting deal closing done" within the timeline announced. Defendant Masrani responded by communicating his expectation that the deal would close in Q1 2023 for TD Bank:

> ***We at TD pride ourselves in having excellent regulatory relationships. We've done quite a few transactions, are familiar with what the regulatory requirements are, and this is consistent with our thinking***. So we will follow the customary regulatory requirements that you would expect us to do . . . our expectation is that this will close in the first quarter of fiscal '23, TD's first quarter, which is by January 31 of 2023. ***So our expectation is that this will get approved and get closed around the 9-month mark***.[5]

51. Later on the same call, another analyst inquired further about the projected timeline to close the Transaction "given the size of the [T]ransaction and the sort of the situation of the Fed in the U.S., [and that] the probability of the delay is relatively high." Masrani reiterated his expectation that the deal would close during TD Bank's Q1 2023:

> ***[O]ur expectation is that we close by the first quarter, fiscal quarter of '23, which is before January 31***. And then all these deals have extension rates of – in case the approvals are delayed or for whatever reason, we're not able to close during that time. It gets extended. And

---

[5] TD Bank provided FHN shareholders with a transcript of the Feb 28 Conf Call by filing it on Schedule 14A as Soliciting Material under §240.14a-12.

then finally, there's a final extension as well, and that's just customary. I don't think there's anything unique in this deal that you should be reading. Every deal we've done has had these provisions.

52.    On March 3, 2022, TD Bank issued a Report to Shareholders regarding its Q1 2022 results, which it publicly filed with the SEC on Form 6-K ("Q1 2022 Form 6-K"). The Q1 2022 Form 6-K referenced the discussion of risk in the 2021 Form 40-F and 2021 MD&A, and directed investors to those filings for a complete discussion:

> ***The Bank's risk governance structure and risk management approach have not substantially changed from that described in the [2021 Form 40-F]***. Additional information on risk factors can be found in this document and the 2021 MD&A under the heading "Risk Factors and Management". ***For a complete discussion of the risk governance structure and the risk management approach, refer to the "Managing Risk" section in the Bank's 2021 Annual Report***.

53.    On March 3, 2022, TD Bank also published an investor presentation that discussed the Transaction and repeated the claim that "***[l]ike TD, First Horizon has a strong team with a growth mindset and a disciplined risk culture***."  In addition, TD Bank repeatedly touted that its business model was "underpinned by a strong risk culture."

54.    On March 7, 2022, TD Bank issued its 2022 investor proxy statement, which it filed with the SEC on Form 6-K.  The proxy statement represented that in 2021 the Audit Committee had "(i) ***oversaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic***

20

***sanctions/anti-bribery and anti-corruption program (AML program), including the related risk assessment***; (ii) reviewed and approved the bank's AML department annual plan, including the bank's AML strategic priorities; (iii) received regular updates on the effectiveness of key controls, status of key initiatives, operational performance, top and emerging risks and regulatory developments, including with respect to the impacts of the ongoing pandemic; and (iv) received regular updates from the bank's chief anti-money laundering officer and key executives from the project team on the status of key technology-related projects to enhance operational effectiveness and efficiency, as well as an education session on AML technology."

55.    On March 9, 2022, Defendant Tran participated in the RBC 2022 Global Financial Institutions Conference.  TD Bank provided a transcript of the conference to FHN shareholders on March 21, 2022, when TD Bank filed it with the SEC on Schedule 14A as Soliciting Material under Section 240.14a-12.  During the call, Defendant Tran reiterated the "disciplined risk culture" that purportedly existed at TD Bank: "[i]f you look at [FHN], they're locally rooted with a strong balance sheet and also ***with the discipline risk culture. And that's what we're all about***."

56.    In March 2022, TD Bank also published the latest version of its AML Statement, which represented that TD Bank's commitment to detect and deter persons engaged in money laundering was formalized through "the establishment of an enterprise-wide Anti-Money Laundering/Anti-Terrorist Financing (AML/ATF)

and Sanctions risk and compliance management program (Global AML Program) that is designed to detect and report suspected money laundering and terrorist financing and activity prohibited by sanctions." The AML Statement further represented that among the requirements of the Global AML Program were (i) "ongoing monitoring to detect and report suspicious transactions or activities," (ii) "regulatory reporting of prescribed transactions," and (iii) "independent testing of control effectiveness."

57.    On May 26, 2022, TD Bank issued a Report to Shareholders regarding its Q2 2022 results, which it publicly filed with the SEC on Form 6-K ("Q2 2022 Form 6-K"). The Q2 2022 Form 6-K referenced the discussion of risk in the 2021 Form 40-F and 2021 MD&A, and directed investors to those filings for a complete discussion:

> ***The Bank's risk governance structure and risk management approach have not substantially changed from that described in the [2021 Form 40-F]***. Additional information on risk factors can be found in this document and the 2021 MD&A under the heading "Risk Factors and Management". ***For a complete discussion of the risk governance structure and the risk management approach, refer to the "Managing Risk" section in the Bank's 2021 Annual Report***.

58.    On May 26, 2022, TD Bank also published an investor presentation repeating the claim that its business model is "***underpinned by a strong risk culture***." Concerning the Transaction, the investor presentation stated that TD Bank "***[f]iled all required regulatory applications in March with Fed, OCC and OSFI,***

*among others*," and that it "*[c]ontinue[d] to target close in Q1 FY2023, subject to receipt of regulatory and shareholder approvals*."

59.     On May 26, 2022, on TD Bank's Q2 2022 earnings call, when an analyst observed that the "U.S. regulatory process ha[d] become a little more prolonged over the last year," Defendant Masrani responded, "[o]ur process continues. *And we did this transaction on the basis that . . . it meets all the requirements of all the regulators*. So, we continue to be comfortable and are working hard to get it to closing." Subsequently, in response to another analyst question concerning regulatory approval, Defendant Masrani stated that "I feel comfortable that  . . . we [will] close the transaction, the way we have intended."

60.     On a conference call on August 2, 2022 to discuss recent acquisitions, when asked whether he had any reason "to believe why the deal [to acquire FHN] may not close as per the original timeline," and whether there were any "regulatory or other issues that may delay the deal at this point," Defendant Masrani responded:

> *No. I have no reason to believe that* . . . . It is following its normal process within the US regulatory requirements. And we obviously cannot talk about our conversations with our regulators would feel comfortable that *is proceeding at the pace we expected and we are hoping that we can close it within the timeline we have stipulated*.

61.     On August 25, 2022, TD Bank issued a Report to Shareholders regarding its Q3 2022 results, which it publicly filed with the SEC on Form 6-K ("Q3 2022 Form 6-K"). Concerning the Transaction, the Q3 2022 Form 6-K stated:

Last week's public meeting before the joint Office of the Comptroller of the Currency and the Federal Reserve Board was another important milestone in TD's ongoing work with community groups and regulators to advance the approval process for the First Horizon transaction. ***TD continues to expect the transaction to close in the first quarter of fiscal 2023 and looks forward to welcoming First Horizon customers and associates to the Bank***.

62.    The Q3 2022 Form 6-K also referenced the discussion of risk in the 2021 Form 40-F and 2021 MD&A, and directed investors to those filings for a complete discussion:

> ***The Bank's risk governance structure and risk management approach have not substantially changed from that described in the [2021 Form 40-F]***. Additional information on risk factors can be found in this document and the 2021 MD&A under the heading "Risk Factors and Management". ***For a complete discussion of the risk governance structure and the risk management approach, refer to the "Managing Risk" section in the Bank's 2021 Annual Report***.

63.    On August 25, 2022, TD Bank also published an investor presentation repeating the claim that its business model is "***underpinned by a strong risk culture***." Concerning the Transaction, the investor presentation stated "***[t]ransaction close expected in Q1 FY2023***, subject to receipt of regulatory approvals."

64.    On August 25, 2022, on TD Bank's Q3 2022 earnings call, Defendant Masrani reiterated that he expected the Transaction "to close in the first fiscal quarter of 2023." When asked yet again about any risks that may delay the Transaction from closing, Defendant Masrani responded, "[o]ur deal continues to progress in the

normal course, ***there is nothing out there to suggest that, that is different this time around***."

65.    On September 14, 2022, at the Barclays Global Financial Services Conference, when asked for an update on the timeline for the Transaction, Defendant Salom advised that "[w]e do expect to close the transaction at the end of the fiscal first quarter. And we're tracking well against that." Defendant Salom then added:

> [O]n August 18th we had the public hearing, the OCC, the Fed hosted. That is the normal part of the application process. ***But to your point, I'm sure there's going to be a lot of questions about how confident are we? We're extremely confident***. We believe this transaction does not represent any financial stability or competitive consolidation risk. We've already announced that we will protect all the front-line staff, we will be retaining all the retail and commercial bankers. Likewise, we won't be closing any stores. ***So, if you look at the strength of the application, we're quite excited about getting this done in short order***.

66.    The statements referenced in ¶¶ 47-65 were materially false and/or misleading, and omitted material facts that rendered such statements, in light of the circumstances under which they were made, false and misleading.  Specifically, Defendants misrepresented and/or failed to disclose that: (i) TD Bank's AML policies and procedures were materially deficient at all relevant times; (ii) such material deficiencies were delaying regulatory approval of the Transaction and thus posed a significant risk to the closing of the Transaction; and (iii) as a result, Defendants' public statements concerning the timeline for closing the Transaction were materially false and misleading at all relevant times.

**The Undisclosed Risk to the Closing of the Transaction Posed by TD Bank's Materially Deficient AML Policies and Procedures Begins to Materialize**

67.    The first inkling that regulatory issues may derail approval of the Transaction surfaced in filings and on calls related to TD Bank's Q4 2022 results when Defendant Masrani revealed that the timing for closing the Transaction has slipped from TD Bank's Q1 2023 to the first half of 2023.

68.    On December 1, 2022, TD Bank published an investor presentation repeating the claim that its business model is "***underpinned by a strong risk culture***." The investor presentation also provided an update regarding the Transaction.  Notably, however, unlike the investor presentations published on May 26, 2022, and August 25, 2022, that had projected the Transaction would close in TD Bank's ***Q1 2023***, the investor presentation published on December 1, 2022, revised that timetable to the ***first half of 2023***, stating that "***[c]urrently planning to close in the first half of F2023*** subject to customary closing conditions, including approvals from U.S. and Canadian regulators."

69.    On December 1, 2022, on TD Bank's Q4 2022 earnings call, Defendant Masrani advised that TD Bank was "planning to close the [Transaction] in the ***first half of fiscal 2023*** subject to customary closing conditions, including approvals from U.S. and Canadian regulatory authorities." After observing that Defendant Masrani had previously guided on the Q3 2022 earnings call that the Transaction would close in ***Q1 2023***, and that the timing had now slipped to the ***first half of***

*2023*, an analyst inquired "[w]hat's prompting the delayed expectation of closing?" Defendant Masrani responded, "so we don't control the timing of all the regulatory approvals, ***but we are confident that we will get closing within the time line that we've put out***." When the analyst pressed for specifics—"are they taking a closer look at anything? Are you anticipating having to make any adjustments to your product going up or your schedule in advance of the close?"—Defendant Masrani advised, "***No, I'm not aware of anything of the sort you're mentioning***."

70.    On January 9, 2023, Defendant Masrani spoke with an analyst at the RBC Markets Canadian Bank CEO Conference. When asked for his "expectations on closing" the Transaction, Defendant Masrani responded in relevant part:

> On First Horizon, there were certain aspects that needed to be done. The First Horizon shareholders had to vote on the transaction. That did take place and folks who decided to vote, 99% of them decided to vote in favor and that was great. ***There was a public meeting organized by the regulators and that went pretty well*** . . . . And the final one is the regulatory approvals by the major agencies in the United States. Now that is an unknown, in the U.S., the latest deals seem to take longer than what they used to. One deal that was approved took 14 or 15 months. Another deal was announced approximately 2 to 3 months before our deal got announced and we are about 9 or 10 months into ours, end of February is when we announced First Horizon, but the deal that was announced 2 or 3 months before ours has not yet been approved. ***Given all that, last quarter, I said that instead of our original expectation of closing within the first fiscal quarter of this year, it will be the first fiscal half, which seems to be appropriate given all the other stuff that's been going on. That's our expectation on when that gets done***.

71.    On February 9, 2023, the Companies issued a joint press release ("Feb 2023 Joint Release"), announcing that they had mutually agreed to extend the

deadline to close the Transaction from February 27, 2023, to May 27, 2023, stating,

in relevant part:

> *Both banks are fully committed to the transaction, which will benefit their customers, local communities, and other stakeholders*
>
> TORONTO, CHERRY HILL, N.J. and MEMPHIS, Tenn., Feb. 9, 2023 /CNW/ - TD Bank Group ("TD") (TSX: TD) and (NYSE: TD) and First Horizon Corporation ("First Horizon") (NYSE: FHN) today announced that they have mutually agreed to extend the outside date of their proposed transaction from February 27 to May 27, 2023, in accordance with the terms of the merger agreement.
>
> TD and First Horizon are fully committed to the merger ***and continue to make significant progress in planning for the closing and the integration of the companies***. Shareholders of First Horizon have voted overwhelmingly to approve the transaction, and progress is being made on a Community Benefits Plan in support of local communities across the TD and First Horizon footprints in the U.S.
>
> Customary closing conditions, including approvals from regulatory authorities in the U.S. and Canada, are required to close the transaction.

72.    The Feb 2023 Joint Release referred generically to the requirement of

regulatory approvals to close the Transaction.  The Feb 2023 Joint Release, however,

failed to disclose that the reason the Companies had to extend the outside date of the

Transaction was because TD Bank was under scrutiny by regulators at the OCC and

the Federal Reserve ("Regulatory AML Scrutiny") because of TD Bank's materially

deficient AML policies and procedures, including the handling of suspicious

customer transactions and the speed with which TD Bank brought such transactions

to the attention of U.S. authorities.

73.    The Regulatory AML Scrutiny was a concealed risk to the consummation of the Transaction. The Companies were obligated to disclose this risk to FHN shareholders, but improperly failed to do so. Instead, the Feb 2023 Joint Release misleadingly stated that "TD and First Horizon are fully committed to the merger and ***continue to make significant progress in planning for the closing and the integration of the companies***." This optimistic statement misrepresented the likelihood of the Transaction closing as being substantially more promising than the Companies knew to be the case because of the Regulatory AML Scrutiny.

74.    On March 1, 2023, before market hours, FHN filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 10-K"). The SEC requires a Form 10-K to be used to file annual reports pursuant to Section 13 or 15(d) of the Exchange Act. Item 1A of a Form 10-K must, under the caption "Risk Factors," set forth the risk factors described in Item 105 of Regulation S-K (17 C.F.R. § 229.105) applicable to the company filing the Form 10-K. Item 105 provides in relevant part:

> (a) Where appropriate, provide under the caption "Risk Factors" a discussion of the ***material factors that make an investment in the registrant or offering speculative or risky***. This discussion must be organized logically with relevant headings and each risk factor should be set forth under a subcaption that adequately describes the risk. ***The presentation of risks that could apply generically to any registrant or any offering is discouraged***, but to the extent generic risk factors are presented, disclose them at the end of the risk factor section under the caption "General Risk Factors."

(b) Concisely explain how each risk affects the registrant or the securities being offered . . .

75.    The language "material factors" requires companies to disclose risks to which reasonable investors would attach importance in making investment or voting decisions concerning a company's stock.

76.    The 2022 10-K revealed that, in stark contrast to Defendant Masrani's recent statements that the Transaction would close in the first half of 2023, TD Bank had informed FHN that it "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023." Specifically, in Item 1A, Risk Factors, the 2022 10-K disclosed in relevant part:

> ***Receipt of regulatory approvals for the Pending TD Merger has taken longer than originally anticipated, and TD does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by the current outside date of May 27, 2023.*** On February 9, 2023, FHN and TD agreed to extend the outside date to May 27, 2023. Subsequent to the extension, TD recently informed FHN that TD does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023, and that TD cannot provide a new projected closing date at this time. If the Pending TD Merger does not close by May 27, 2023, then an amendment to the Merger Agreement will be required to further extend the outside termination date. TD has initiated discussions with FHN regarding a potential further extension of the outside date. There can be no assurance that an extension will ultimately be agreed ***or that TD will satisfy all regulatory requirements so that the regulatory approvals required to complete the Pending TD Merger will be received.***
>
> *Regulatory approvals may not be received, have taken longer than expected, and may impose conditions that are not presently anticipated.* ***Before the Pending TD Merger may be completed, various approvals, consents, and non-objections must be obtained from the Federal***

***Reserve, the Office of the Comptroller of the Currency, TD's primary federal banking regulator, and various other regulatory, antitrust, and other authorities in the United States and Canada***. In determining whether to grant these approvals, such regulatory authorities consider a variety of factors, including the regulatory standing of each party. These approvals have taken longer to receive than originally anticipated and could be further delayed or not obtained at all, including due to: an adverse development in either party's regulatory standing or in any other factors considered by regulators when granting such approvals; governmental, political or community group inquiries, investigations or opposition; or changes in legislation or the political environment generally. The Federal Reserve has stated that if material weaknesses are identified by examiners before a banking organization applies to engage in expansionary activity, the Federal Reserve will expect the banking organization to resolve all such weaknesses before applying for such expansionary activity. The Federal Reserve has also stated that if issues arise during the processing of an application for expansionary activity, it will expect the applicant banking organization to withdraw its application pending resolution of any supervisory concerns.

* * *

***The TD Merger Agreement may be terminated in accordance with its terms, and the Pending TD Merger may not be completed***. ***The TD Merger Agreement is subject to a number of conditions which must be fulfilled in order to complete the Pending TD Merger. Those conditions include:*** . . . (ii) ***the receipt of all required regulatory approvals which are necessary to close the Pending TD Merger and the expiration of all statutory waiting periods without the imposition of any materially burdensome regulatory condition*** . . . . The conditions to the closing may not be fulfilled in a timely manner or at all, and, accordingly, the Pending TD Merger might not be completed. In addition, the parties can mutually decide to terminate TD Merger Agreement at any time.

77.    In the 2022 10-K, FHN had a duty to disclose with specificity the risks posed by the Regulatory AML Scrutiny to the closing of the Transaction because FHN investors would attach importance to that risk in deciding whether to invest in

FHN stock.  FHN, however, failed to make such disclosure.  Instead, the 2022 10-K described the process for securing regulatory approval of the Transaction using generic and boilerplate language that could apply to any transaction between two banks subject to regulatory oversight.

78.    Upon disclosure in the 2022 10-K of the news that TD Bank had informed FHN that it "does not expect that the necessary regulatory approvals will be received in time to complete the Pending TD Merger by May 27, 2023," FHN's stock price fell $2.63 per share, or 10.62%, to close at $22.14 per share on March 1, 2023.

79.    TD Bank also had an obligation to disclose that the reason the Companies had to extend the outside date of the Transaction was because of the Regulatory AML Scrutiny. Yet, TD Bank failed to do so, and instead continued to state that it was fully committed to the Transaction and continued to engage with regulators. For example, on March 2, 2023, TD Bank issued a Report to Shareholders regarding its Q1 2023 results, which it publicly filed with the SEC on Form 6-K ("Q1 2023 Form 6-K"). The Q1 2023 Form 6-K quoted Defendant Masrani as stating that "TD is fully committed to the transaction and we are in discussions with First Horizon about a potential further extension beyond May 27th." Similarly, on March 2, 2023, TD Bank published an investor presentation

indicating that TD Bank would "[c]ontinue to engage with regulators on applications."

80.    The statements referenced in ¶¶ 68-71, 73, 76, and 79 were materially false and/or misleading, and omitted material facts that rendered such statements, in light of the circumstances under which they were made, false and misleading. Specifically, Defendants misrepresented and/or failed to disclose that: (i) TD Bank's AML policies and procedures were materially deficient at all relevant times; (ii) such material deficiencies were delaying regulatory approval of the Transaction and thus posed a significant risk to the closing of the Transaction; and (iii) as a result, Defendants' public statements concerning the timeline for closing the Transaction were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

81.    On May 3, 2023, according to a Capital Forum being circulated among traders, Defendant Masrani had a meeting with officials of the OCC concerning the Transaction on March 9, 2023 that was also attended by TD Bank's outside counsel.

82.    On this news, FHN's stock price fell $1.14 per share, or 7.04%, to close at $15.05 per share on May 3, 2023.

83.    Then, on May 4, 2023, the Companies issued a joint press release revealing that "TD Bank and First Horizon Mutually Agree to Terminate Merger Agreement."  The press release explained that "TD informed First Horizon that TD

does not have a timetable for regulatory approvals to be obtained for reasons unrelated to First Horizon. Because there is uncertainty as to when and if these regulatory approvals can be obtained, the parties mutually agreed to terminate the merger agreement." During an FHN investor call held that day, FHN further revealed that TD Bank "could not provide assurance of regulatory approval in 2023 *or 2024*."

84.    On this news, FHN's stock price fell $4.99 per share, or 33.16%, to close at $10.06 per share on May 4, 2023.

85.    On May 8, 2023, in an article titled "Concern Over TD Anti-Money-Laundering Practices Helped Scuttle First Horizon Deal," the *WSJ* reported that, based on its investigation, (i) TD Bank's "handling of suspicious customer transactions was behind regulators' refusal to bless the Canadian lender's $13.4 billion bid to buy First Horizon," and (ii) the "reluctance by the Office of the Comptroller of the Currency and the Federal Reserve to give TD a clean bill of health on its anti-money-laundering practices proved to be the biggest obstacle" to gaining regulatory approval. The article continued that "[t]he regulators' concerns stemmed from the way TD handled unusual transactions in recent years, and the speed at which some of them were brought to the attention of U.S. authorities . . . . The bank flagged 28 customer transactions in the period." According to the article, "TD had pledged to regulators that it would make its anti-money-laundering policies more

comprehensive and timely, but it wasn't enough to win approval for the deal." *Bloomberg News* similarly reported that the transaction was "held up as U.S. regulators scrutinized the Toronto lender's handling of suspicious customer transactions."

86.    Defendants' materially false and misleading statements and omissions concerning the risks to regulatory approval of the Transaction posed by TD Bank's materially deficient AML policies and procedures caused Plaintiff and other Class members to suffer significant losses when these undisclosed regulatory risks materialized and caused the market value of FHN's securities to decline precipitously.

## SCIENTER ALLEGATIONS

87.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless in not knowing that TD Bank's materially deficient AML policies and procedures, and the Regulatory AML Scrutiny, would result in delayed or denied regulatory approvals for the Transaction. In particular, Section 6.1(b) of the agreement governing the Transaction provided that FHN and TD Bank would exchange information and consult with one another concerning efforts to obtain regulatory approval of the Transaction, and thus all Defendants were aware, or reckless in not being aware, of TD Bank's materially deficient AML policies and procedures and the Regulatory AML Scrutiny:

Parent [i.e., TD Bank] and Company [i.e., FHN] shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case, subject to applicable laws relating to the exchange of information, all the information relating to Company or Parent, as the case may be, and any of their respective Subsidiaries, which appears in any filing made with, or written materials submitted to, any third party or any Regulatory Agency or Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties hereto shall act reasonably and as promptly as practicable. The parties hereto agree that they will consult with each other with respect to obtaining all permits, consents, approvals and authorizations of all third parties, Regulatory Agencies and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other apprised of the status of matters relating to completion of the transactions contemplated in this Agreement, and each party shall consult with the other in advance of any meeting or conference with any Regulatory Agency or Governmental Entity in connection with the transactions contemplated by this Agreement and, to the extent permitted by such Regulatory Agency or Governmental Entity, give the other party and/or its counsel the opportunity to attend and participate in such meetings and conferences; provided, that each party shall promptly advise the other party with respect to substantive matters that are addressed in any meeting or conference with any Regulatory Agency or Governmental Entity in connection with or affecting the transactions contemplated by this Agreement which the other party does not attend or participate in, to the extent permitted by such Regulatory Agency or Governmental Entity and subject to applicable law and Section 9.14.

88.     Defendants also acted with scienter in that, in light of TD Bank's

materially deficient AML policies and procedures, and the Regulatory AML

Scrutiny, Defendants knew or were reckless in not knowing that the public

documents and statements issued or disseminated in the name of FHN and/or TD

Bank concerning the Transaction during the Class Period were materially false and

misleading and/or omitted to disclose material information concerning the Transaction that rendered statements regarding the Transaction misleading.

89.    As set forth herein, the Individual Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding TD Bank's materially deficient AML policies and procedures, their control over, receipt, and/or modification of the Companies' allegedly materially misleading statements and omissions, and/or their positions with the Companies, which made them privy to confidential information concerning the Transaction, including the risk to the Transaction posed by the Regulatory AML Scrutiny.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

90.    To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Companies who knew that the statement was false when made.

## LOSS CAUSATION

91.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Plaintiff and the Class.

92.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions of material facts and engaged in a scheme to deceive the market.  This artificially inflated the prices of FHN's securities and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, and the undisclosed risks to the Transaction posed by the Regulatory AML Scrutiny began to materialize, the price of FHN's securities fell precipitously, as the prior artificial inflation came out of the price.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

93.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired FHN securities during the Class Period; and were damaged upon the revelation of the alleged corrective disclosures and materialization of undisclosed risks.  Excluded from the Class are Defendants herein, the officers and directors of the Companies, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FHN securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, FHN shares actively traded on the NYSE, an open and efficient market, under the ticker symbol "FHN."  Millions of FHN shares were traded publicly during the Class Period on the NYSE.  As of April 28, 2023, FHN had more than 537 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by FHN or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

97.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the Transaction;

- whether Defendants issued false and misleading statements during the Class Period concerning the Transaction;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements during the Class Period concerning the Transaction;

- whether the prices of FHN securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

98.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

99.    Plaintiff will rely, in part, upon the presumption of reliance established

by the fraud-on-the-market doctrine, in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- FHN securities are traded in an efficient market;

- FHN's shares were liquid and traded with moderate to heavy volume during the Class Period;

- FHN traded on the NYSE and the Companies were covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FHN's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold FHN securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

100.    Based upon the foregoing, Plaintiff and the members of the Class are

entitled to a presumption of reliance upon the integrity of the market.

101.    Alternatively, Plaintiff and the members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens*

*of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as

41

Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

102.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

103.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FHN securities; and (iii) cause Plaintiff and other

members of the Class to purchase or otherwise acquire FHN securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

105.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each Defendant participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for FHN securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Transaction.

106.   Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly

disregarded that material facts were being misrepresented or omitted as described above.

107.  Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of FHN, the Individual FHN Defendants had knowledge of the details of FHN's internal affairs; and as the senior managers and/or directors of TD Bank, the Individual TD Bank Defendants had knowledge of the details of TD Bank's internal affairs.

108.  The Individual FHN Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual FHN Defendants were able to and did, directly or indirectly, control the content of the statements of FHN.  As officers and/or directors of a publicly-held company, the Individual FHN Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Transaction.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of FHN securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning FHN's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired FHN securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

109.   The Individual TD Bank Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual TD Bank Defendants were able to and did, directly or indirectly, control the content of the statements of TD Bank.  As officers and/or directors of a publicly held company, the Individual TD Bank Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Transaction.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of FHN securities was artificially inflated throughout the Class Period.

110.   In ignorance of the adverse facts concerning the Regulatory AML Scrutiny which were improperly concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired FHN securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

111.   During the Class Period, FHN securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants

made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of FHN securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of FHN securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of FHN securities declined sharply upon the materialization of the concealed risks that Defendants had improperly failed to disclose and thereby caused injury to Plaintiff and other Class members.

112. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of FHN's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the
Individual FHN Defendants)**

114.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.   During the Class Period, the Individual FHN Defendants participated in the operation and management of FHN, and conducted and participated, directly and indirectly, in the conduct of FHN's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Transaction.

116.   As officers and/or directors of a publicly owned company, the Individual FHN Defendants had a duty to disseminate accurate and truthful information with respect to the Transaction, and to promptly correct and update any public statements issued by FHN concerning the Transaction which had become materially false or misleading.

117.   Because of their positions of control and authority as senior officers, the Individual FHN Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which FHN disseminated in the marketplace during the Class Period concerning the Transaction.  Throughout the Class Period, the Individual FHN Defendants exercised their power and authority to cause FHN to engage in the wrongful acts complained of herein. The Individual FHN Defendants, therefore, were "controlling persons" of FHN within the meaning of

Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FHN securities.

118.  Each of the Individual FHN Defendants, therefore, acted as a controlling person of FHN.  By reason of their senior management positions and/or being directors of FHN, each of the Individual FHN Defendants had the power to direct the actions of, and exercised the same to cause, FHN to engage in the unlawful acts and conduct complained of herein.  Each of the Individual FHN Defendants exercised control over the general operations of FHN and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

119.  By reason of the above conduct, the Individual FHN Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FHN.

## COUNT III

### (Violations of Section 20(a) of the Exchange Act Against the Individual TD Bank Defendants)

120.  Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

121.  During the Class Period, the Individual TD Bank Defendants participated in the operation and management of TD Bank, and conducted and participated, directly and indirectly, in the conduct of TD Bank's business affairs.

48

Because of their senior positions, they knew the adverse non-public information about the Transaction.

122.   As officers and/or directors of a publicly owned company, the Individual TD Bank Defendants had a duty to disseminate accurate and truthful information with respect to the Transaction, and to promptly correct and update any public statements issued by TD Bank concerning the Transaction which had become materially false or misleading.

123.   Because of their positions of control and authority as senior officers, the Individual TD Bank Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which TD Bank disseminated in the marketplace during the Class Period concerning the Transaction.  Throughout the Class Period, the Individual TD Bank Defendants exercised their power and authority to cause TD Bank to engage in the wrongful acts complained of herein. The Individual TD Bank Defendants, therefore, were "controlling persons" of TD Bank within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FHN securities.

124.   Each of the Individual TD Bank Defendants, therefore, acted as a controlling person of TD Bank.  By reason of their senior management positions and/or being directors of TD Bank, each of the Individual TD Bank Defendants had

the power to direct the actions of, and exercised the same to cause, TD Bank to engage in the unlawful acts and conduct complained of herein. Each of the Individual TD Bank Defendants exercised control over the general operations of TD Bank and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. By reason of the above conduct, the Individual TD Bank Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TD Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 1, 2023                          Respectfully submitted,

                                             POMERANTZ LLP

                                             */s/ Thomas H. Przybylowski*
                                             Thomas H. Przybylowski
                                             Jeremy A. Lieberman
                                             (*pro hac vice* application forthcoming)
                                             J. Alexander Hood II
                                             (*pro hac vice* application forthcoming)
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (917) 463-1044
                                             tprzybylowski@pomlaw.com
                                             jalieberman@pomlaw.com
                                             ahood@pomlaw.com

                                             WOHL & FRUCHTER LLP
                                             Joshua E. Fruchter
                                             (*pro hac vice* application forthcoming)
                                             25 Robert Pitt Drive, Suite 209G
                                             Monsey, New York 10952
                                             Telephone: (845) 290-6818
                                             Facsimile: (718) 504-3773
                                             jfruchter@wohlfruchter.com

                                             *Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Andrew Amicarelli, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against First Horizon Corporation ("FHC") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire FHC securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired FHC securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in FHC securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

**Executed** _5/15/2023_____
                     **(Date)**


DocuSigned by:

*Andrew Amicarelli*

_____
1CBDA1A32D2D4CE...
                **(Signature)**



Andrew Amicarelli
**(Type or Print Name)**

**First Horizon Corporation (FHN)**                                                                **Andrew Amicarelli**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 4/17/2023 | 542 | $18.4200 |
| Purchase | C 20231215 18 | 4/14/2023 | 5 | $3.5000 |
| Purchase | C 20231215 20 | 4/14/2023 | 5 | $2.1000 |